EDDIE PAPIC *v.* JOHN P. BURKE, BANKING
COMMISSIONER, ET AL.
(AC 28698)

Bishop, Gruendel and Robinson, Js.

Argued December 1, 2008—officially released March 17, 2009

*Eddie Papic*, pro se, the appellant (plaintiff).

*William J. Prensky*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellees (defendants).

*Opinion*

GRUENDEL, J. The pro se plaintiff, Eddie Papic, appeals from the judgment of the trial court dismissing his appeal from the "findings of fact, conclusions of law and order" (order) of the defendant, the banking commissioner.[1] In that order, the defendant found that, in connection with the offer, sale or purchase of a security, the plaintiff (1) omitted to state material facts necessary to make statements not misleading in violation of General Statutes § 36b-4 (a) (2), (2) made untrue statements of material fact also in violation of § 36b-4

---

[1] The plaintiff named the banking commissioner and the department of banking as defendants. We refer in this opinion to the banking commissioner as the defendant.

(a) (2), (3) engaged in fraudulent practices or courses of business in violation of General Statutes § 36b-4 (a) (3), and (4) failed to register as an investment adviser agent in violation of General Statutes (Rev. to 2003) § 36b-6 (c). The Superior Court affirmed that decision. On appeal to this court, the plaintiff claims that (1) federal law preempts the defendant's authority to penalize him for fraud and misrepresentation, (2) the defendant improperly found that the plaintiff violated §§ 36b-4 (a) and 36b-6 (c), and (3) the plaintiff was deprived of due process of law. We affirm the judgment of the trial court.

The record reveals the following relevant facts. In September, 2000, the plaintiff and a colleague, Wilder Carnes, set out to create an investment fund. Their endeavors resulted in the creation of Criterion Investment Fund I L.P. (fund), a hedge fund based in Connecticut and organized as a limited partnership. Criterion Investment Capital LLC (LLC) was the fund's general partner and was managed by the plaintiff and Carnes. In December, 2000, the fund began offering limited interests in the partnership to investors, and issued a confidential offering circular (circular) for the stated purpose of permitting prospective investors to evaluate the offering and the fund. The circular and its associated documentation were reviewed by counsel, who did not raise any concerns with regard to the disclosures contained therein.

The circular indicated that the minimum investment in the fund was $500,000 and that each investor must have a net worth of more than $1 million. Although the circular also indicated that the LLC could waive these minimum requirements in individual cases, not a single investment in the fund met the $500,000 requirement, and two investors did not meet the minimum net worth requirement. The circular also indicated that the fund would invest principally in equity securities, but by

December, 2001, all of the fund's trades were in options. The circular further provided that the LLC would furnish each investor with an annual report containing audited financial statements and quarterly reports on the status of the fund. The LLC never transmitted any such reports to its investors. Finally, the circular indicated that the plaintiff and Carnes were the managers of the LLC and were the "portfolio managers primarily responsible for the day-to-day management of the [fund]." As such, the circular contained their biographies. The plaintiff wrote his biography, which did not contain any reference to a personal bankruptcy or a chapter 7 discharge in bankruptcy[2] that he received on March 31, 1998.

Armed with the circular, the plaintiff solicited Edward Segan as a potential investor during the summer of 2001. He provided Segan with a copy of the circular, a performance document indicating a year to date return of 5.62 percent and a sample account statement. On the basis of these documents and the plaintiff's representations, Segan invested $152,724.01 in the fund on December 10, 2001, becoming the last limited partner to join the fund. After Segan joined the fund, the plaintiff informed him that his funds would not be invested until 2002. Despite this representation, the plaintiff invested Segan's funds on December 10, 2001, and by January 1, 2002, Segan's investment had decreased in value to $10,947. After Segan provided the plaintiff with his initial investment, he never received any written reports from the plaintiff, the LLC or the fund. When Segan inquired of the plaintiff in January, 2002, regarding the value of his investment, the plaintiff informed him that

---

[2] Section 727 (b) of title 11 of the United States Code provides in relevant part: "[Subject to limited exceptions], a discharge . . . discharges the debtor from all debts that arose before the date of the order for relief under this chapter . . . ." Section 524 (a) of title 11 of the United States Code provides that a discharge in bankruptcy voids any judgment discharged under § 727 and enjoins creditors from collecting prebankruptcy debts.

it had decreased approximately 10 percent in value, despite an actual decrease of approximately 95 percent. In May, 2002, Segan filed a complaint with the defendant.

In response to Segan's complaint, on February 5, 2004, the defendant issued a document to the plaintiff entitled "Order to Cease and Desist, Notice of Intent to Fine and Notice of Right to Hearing." In that document, the defendant charged the plaintiff with violations of § 36b-4 (a) (2) for omitting to state material facts and for making untrue statements of material facts, with violations of § 36b-4 (a) (3)[3] for engaging in fraudulent practices or courses of business and with a violation of § 36b-6 (c)[4] for engaging in unregistered investment adviser agent activity.

The defendant held a hearing between November 18, 2004, and February 24, 2005, and on August 8, 2005, issued the order that serves as the basis for the present appeal.[5] With regard to omitting material facts, the defendant charged the plaintiff with failure to inform Connecticut investors that (1) the plaintiff had filed for personal bankruptcy, (2) no investor had invested the minimum of $500,000, (3) the fund was trading principally in options, (4) two investors did not have a net

[3] General Statutes § 36b-4 (a) provides in relevant part: "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly . . . (2) make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

[4] General Statutes (Rev. to 2003) § 36b-6 (c) provided in relevant part: "No individual shall transact business as an investment adviser agent, within or from this state, unless he is registered as an investment adviser agent of the investment adviser for whom he acts in transacting such business. . . ." Note that the statutory language quoted in the defendant's order is that of the 2005 revision, but the applicable substantive provisions were unchanged.

[5] The defendant issued a minor modification to the order on September 8, 2005.

worth exceeding $1 million and (5) the LLC did not transmit annual and quarterly reports to the fund's investors. In the order, the defendant found that the plaintiff had violated § 36b-4 (a) (2) on each of these charges except the third, regarding trading principally in options. With regard to making untrue statements of material fact, the defendant charged the plaintiff with making four untrue statements of material facts in connection with the offer, sale or purchase of a security, also in violation of § 36b-4 (a) (2), by (1) providing Segan with the sample account statement, (2) providing Segan with the performance document indicating a return of 5.62 percent, (3) assuring Segan that his funds would not be invested until January, 2002, when his funds were actually invested on December 10, 2001, and (4) informing Segan that his funds had decreased 10 percent in value despite an actual decrease of more than 95 percent. In his order, the defendant found that only the latter two of these constituted violations of § 36b-4 (a) (2). With regard to engaging in fraudulent practices or courses of business, the defendant charged the plaintiff with violations of § 36b-4 (a) (3) for each of the same activities that formed the bases of the charges under § 36b-4 (a) (2) with the exception of failure to disclose the plaintiff's bankruptcy. In his order, the defendant found that each of the plaintiff's charged activities constituted violations of § 36b-4 (a) (3) except for (1) the charge involving the sample account statement and performance document, and (2) the charge of investing principally in options and indicating that the fund's objective was to achieve superior long-term capital appreciation with moderate risk. Finally, the defendant's order found that the plaintiff violated § 36b-6 (c) by transacting business as an unregistered investment adviser agent.

In summary, the defendant found four violations of § 36b-4 (a) (2) for omissions of material fact in the offer

and sale of a security, two violations of § 36b-4 (a) (2) for making untrue statements of material fact in the offer and sale of a security, three violations of § 36b-4 (a) (3) for engaging in a fraudulent practice or course of business,[6] and one violation of § 36b-6 (c) for transacting business as an investment adviser agent and failing to register as such. As a result, the defendant ordered the plaintiff to cease and desist from violating §§ 36b-4 (a) (2) and (3), and 36b-6 (c). He further ordered the plaintiff to pay a civil penalty of $40,000. The plaintiff appealed to the Superior Court, which affirmed the decision of the defendant and dismissed the appeal. This appeal followed.

We begin by setting forth our standard of review for appeals from the defendant's administrative decisions. "Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedure Act, General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the

---

[6] In finding three violations of General Statutes § 36b-4 (a) (3), the defendant consolidated certain factual charges regarding the contents of the circular that had constituted independent violations of § 36b-4 (a) (2).

facts found and could reasonably and logically follow from such facts. . . .

"General Statutes § 4-183 (j), which describes the scope of judicial review of administrative decisions, provides in relevant part: The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal . . . ." (Internal quotation marks omitted.) *Cornelius* v. *Dept. of Banking*, 94 Conn. App. 547, 551–52, 893 A.2d 472, cert. denied, 278 Conn. 913, 899 A.2d 37 (2006).

In his appeal to this court, the plaintiff claims that (1) federal securities law preempts the portions of title 36b of the General Statutes that prohibit making material misrepresentations, making untrue statements and fraud, (2) the defendant improperly found violations of §§ 36b-4 (a) and 36b-6 (c), and (3) the defendant deprived the plaintiff of due process of law. We address each claim in turn.

I

PREEMPTION

"The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution." (Internal quotation marks omitted.) *Hackett* v. *J.L.G. Properties, LLC*, 285 Conn. 498, 504,

940 A.2d 769 (2008). The supremacy clause provides in relevant part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Constitutional jurisprudence recognizes that the laws and regulations of a state may be preempted by federal laws or regulations[7] in three circumstances: "First, Congress can define explicitly the extent to which its enactments pre-empt state law. . . . Pre-emption fundamentally is a question of congressional intent . . . and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one. Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. . . . Finally, state law is pre-empted to the extent that it actually conflicts with federal law." (Citations omitted.) *English* v. *General Electric Co.*, 496 U.S. 72, 78–79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); accord *Hackett* v. *J.L.G. Properties, LLC*, supra, 504.

In the present case, the plaintiff claims that the Securities Act of 1933 as amended, 15 U.S.C. § 77a et seq. (Securities Act), and the Securities and Exchange Commission's regulation D, 17 C.F.R. § 230.501 et seq. (regulation D), preempt General Statutes § 36b-4 (a), thereby precluding the defendant from enforcing that statute. The plaintiff's brief is somewhat unclear as to what language in either regulation D or the Securities Act preempts § 36b-4 (a). The brief is also unclear whether this preemption is accomplished by express preemption, field preemption or conflict preemption. Those

[7] "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings & Loan Assn.* v. *de la Cuesta*, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).

ambiguities are immaterial, however, because no language in the Securities Act or regulation D can be construed to preempt § 36b-4 (a) in the present context under any of the three theories of preemption.

Section 77r (a) of title 15 of the United States Code provides in relevant part: "Except as otherwise provided in this section, no law, rule, regulation, or order or other administrative action of any State . . . (1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a . . . covered security . . . (2) shall directly or indirectly prohibit, limit, or impose any conditions upon the use of . . . (A) with respect to a covered security . . . any offering document that is prepared by or on behalf of the issuer . . . or (3) shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any [covered] security . . . ."[8] This language illustrates an intention to limit the extent to which our General Assembly or the defendant may, for example, dictate the contents of an offering document such as the circular in the present case. The legislative history of § 77r provides a clear indication of its purpose: "The purpose of this legislation is to modernize and rationalize certain important aspects of the regulatory scheme governing our capital markets, including the respective responsibilities of Federal and State governmental authorities over the securities markets. The legislation seeks to further advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by, as a general rule, designating the Federal government as the exclusive regulator of national offerings of securities."

---

[8] The defendant does not contest that the fund qualifies as a covered security.

H.R. Rep. No. 104-622, p. 16 (1996), reprinted in 1996 U.S.C.C.A.N. 3877, 3878.

If the foregoing were the only language of the statute and the only statements of legislative intent, the plaintiff's preemption claim might be well founded. That is not the case. Section 77r (c) (1) sets forth the savings clause, permitting states to retain certain authority over securities transactions: "Consistent with this section the securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions." This language is clear and would seem to obviate the plaintiff's preemption claim. As noted previously, federal preemption of state law "fundamentally is a question of congressional intent . . . ." *English* v. *General Electric Co.*, supra, 496 U.S. 79. In this instance, Congress expressly indicated an intention *not* to preempt state fraud statutes in this context and not to preclude administrative agencies, such as the defendant's, from enforcing fraud statutes.

On the contrary, the legislative history of § 77r (c) indicates that "[i]f . . . a State had undertaken an enforcement action that alleged, for example, that the prospectus contained fraudulent financial data or failed to disclose that principals in the offering had previously been convicted of securities fraud, it is conceivable that State laws regarding fraud and deceit could serve as the basis of a judgment or remedial order that could include a restriction or prohibition on the use of the prospectus or other offering document or advertisement within that State." H.R. Rep. No. 104-622, supra, p. 34, reprinted in 1996 U.S.C.C.A.N. 3897. The present case is perfectly analogous to that envisioned by the

drafters of the savings clause of § 77r. Here, the defendant invoked his authority under state securities laws to address the failure of the principal in the offering—namely, the plaintiff—to disclose key personal information and additional fraudulent and misleading information about the offering itself. Because it was the express intent of Congress not to preempt such actions, the plaintiff's argument fails. See generally, e.g., *Zuri-Invest AG* v. *Natwest Finance Inc.*, 177 F. Sup. 2d 189 (S.D.N.Y. 2001) (state common-law claims alleging securities fraud not preempted by federal law).

The foregoing applies primarily to express preemption and field preemption. The plaintiff also devotes a significant portion of his brief on appeal to arguing that the theory of conflict preemption causes the Securities Act and regulation D to preempt § 36b-4 (a). That simply is not so. Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Internal quotation marks omitted.) *Assn. of International Automobile Manufacturers, Inc.* v. *Abrams*, 84 F.3d 602, 607 (2d Cir. 1996), quoting *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995); see also *Hackett* v. *J.L.G. Properties, LLC*, supra, 285 Conn. 504. Despite spending substantial time in his brief discussing conflict preemption, the plaintiff does not claim that it would have been impossible to comply with federal laws and regulations while simultaneously disclosing (1) his personal bankruptcy, (2) the extent to which the minimum investment and net worth requirements would be enforced and (3) the other fraudulent and misleading statements and omissions for which he was found to have violated § 36b-4 (a). With regard to the other option for conflict preemption,

"where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"; (internal quotation marks omitted) *Assn. of International Automobile Manufacturers, Inc.* v. *Abrams*, supra, 607; the foregoing discussion illustrates that it was the express purpose and objective of Congress to preserve the defendant's ability to enforce the provisions of § 36b-4 (a). Consequently, conflict preemption is not implicated.

II

## FRAUD AND MISREPRESENTATION

We next address the plaintiff's claims that the defendant and the court improperly found that the plaintiff violated §§ 36b-4 (a) and 36b-6 (c). The plaintiff alleges that the decisions of both the defendant and the court were legally flawed and inconsistent with the administrative record. As discussed previously, our review of the decisions of the defendant and the court is very limited in scope. See *Cornelius* v. *Dept. of Banking*, supra, 94 Conn. App. 551–52. "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 833, 955 A.2d 15 (2008). In making this determination, we "must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness . . . in whole or in part." (Internal quotation marks omitted.) *Gillis* v. *White Oak Corp.*, 73 Conn. App. 523, 540, 808 A.2d 712 (2002), cert. granted on other grounds, 262 Conn. 936, 815 A.2d 136 (2003) (appeal withdrawn March 28, 2003). "This substantial evidence standard is highly deferential

and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *Council 4, AFSCME, AFL-CIO* v. *State Board of Labor Relations*, 111 Conn. App. 666, 672, 961 A.2d 451 (2008), cert. denied, 291 Conn. 901, 967 A.2d 112 (2009); see also *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 611, 931 A.2d 319, cert. denied, 284 Conn. 929, 934 A.2d 244 (2007).

## A

### State of Mind

Before evaluating the evidence with regard to the individual charges, we first address the plaintiff's claim that scienter is an element of § 36b-4 (a), and that the defendant could not find a violation of that statute without also finding that the plaintiff knowingly or intentionally committed fraud and misrepresentation. The plaintiff's claim is unfounded. In *Lehn* v. *Dailey*, 77 Conn. App. 621, 825 A.2d 140 (2003), this court, relying on our Supreme Court's guidance, noted that "an individual charged with a violation of § 36b-4 has a defense to such an action if it meets its burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." (Internal quotation marks omitted.) Id., 631, citing *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 46, 699 A.2d 101 (1997). This language illustrates that the burden is on the plaintiff to demonstrate that he neither knew nor reasonably could have known of the untruths and omissions with which he was charged. The defendant implicitly found that the plaintiff did not meet this burden, and the plaintiff's brief does not assert that he made any attempt to demonstrate his lack of knowledge. Rather, he suggests that this court's holding in *Lehn* was incorrect and that this panel should read into the statute an element requiring the defendant to affirmatively establish that the plaintiff

knowingly or intentionally made a fraudulent omission or untruth. This court's policy, however, precludes this panel from "revers[ing] the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 285 n.20, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005). As such, we decline to address the plaintiff's assertion that *Lehn* was decided incorrectly.

### B

### Bankruptcy

The plaintiff asserts that the failure to include any reference to his personal bankruptcy in the circular was not a violation of § 36b-4 (a). The record reflects that the plaintiff received a chapter 7 discharge in bankruptcy in 1998. The circular contained a biography of the plaintiff, written by the plaintiff, which omitted any mention of the personal bankruptcy. There also was evidence in the record, and the defendant found, that at least one Connecticut investor, namely, Segan, invested in the fund without knowledge of the plaintiff's bankruptcy filing. Segan testified that if he had known of the plaintiff's bankruptcy prior to becoming an investor in the fund, he would not have done so.[9] This constitutes substantial evidence from which the defendant

[9] Throughout this analysis, we provide information regarding Connecticut investors' reliance on the plaintiff's and the circular's omissions and representations. This does not imply that the defendant was required to find reliance on the misrepresentations in order to find violations of General Statutes § 36b-4 (a). "A material fact is a fact that 'a reasonable investor would have considered significant in making investment decisions.' *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000). A fact need not be outcome determinative for it to be material. See id., 161–62; *Folger Adam Co.* v. *PMI Industries, Inc.*, 938 F.2d 1529, 1533–34 (2d Cir.), cert. denied, 502 U.S. 983, 112 S. Ct. 587, 116 L. Ed. 2d 612 (1991). On the other hand, '[a]n omitted fact may be immaterial if the information is trivial . . . or is so basic that any investor could be expected to know it . . . .' (Citations omitted; internal quotation marks omitted.) *Ganino* v. *Citizens Utilities Co.*, supra, 162; see also *Levitin* v. *PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998), cert. denied, 525 U.S. 1144, 119 S. Ct. 1039, 143 L. Ed. 2d 47 (1999)." *Lehn* v. *Dailey*, supra, 77 Conn. App. 628–29. Although in *Lehn*,

reasonably could conclude that the plaintiff omitted to state a material fact necessary to make statements not misleading in connection with the offer, sale or purchase of a security. See General Statutes § 36b-4 (a) (2) and (3).

## C

### Minimum Investment

The record further reflects that the circular prominently stated on the cover page in bold capital letters that the minimum investment in the fund was $500,000. That requirement was again indicated on pages one and eighteen. Although these latter references also stated that "the General Partner may waive the minimum subscription requirement for any investor," the record demonstrates that not a single limited partner invested the requisite $500,000. It is also apparent that a Connecticut investor based his decision to invest in the fund, at least in part, on the minimum investment requirement. The foregoing constitutes substantial evidence from which the defendant reasonably could conclude that the plaintiff omitted to state a material fact necessary to make statements not misleading in connection with the offer, sale or purchase of a security. See General Statutes § 36b-4 (a) (2). That substantial evidence may also reasonably have led the defendant to conclude that the plaintiff engaged in an act, practice or course of business that operated or would have operated as a fraud or deceit on a person in connection with the offer, sale or purchase of a security. See General Statutes § 36b-4 (a) (3).

this court defined the requirements of General Statutes § 36b-5 (a), there is no reason why the interpretations of § 36b-5 should not guide our analysis of § 36b-4. Cf. *Lehn* v. *Dailey*, supra, 630 ("[t]he parties have offered no reason, and we can think of none, why the interpretations of § 36b-4 should not guide our analysis of § 36b-5").

## D

### Minimum Net Worth

We next address the charge that the plaintiff's failure to inform Connecticut investors that two investors in the fund did not meet the minimum net worth requirement constituted an omission of material fact and securities fraud. The record reflects that the summary of offering set forth at the beginning of the circular provided that "each investor must have a net worth in excess of $1,000,000 . . . ." The same requirement is set forth again eleven pages later. The first mention of the possibility that the net worth requirement may be waived is on page sixteen of the circular, which provides: "[T]he General Partner may waive minimum suitability standards not imposed by law." There is also evidence in the record that the fund had two investors who did not meet these minimum net worth requirements. At least one Connecticut investor relied on the minimum net worth requirement in deciding to invest in the fund. Combined, this constitutes substantial evidence from which the defendant reasonably could conclude that the plaintiff omitted to state a material fact necessary to make statements not misleading in connection with the offer, sale or purchase of a security, and constituted an act, practice or course of business that would operate as a fraud or deceit. See General Statutes § 36b-4 (a) (2) and (3).

## E

### Reports to Investors

The circular also provided: "The General Partner, on behalf of the Partnership, transmits to each Limited Partner an annual report containing audited financial statements of the Partnership, including a statement of assets and liabilities, a statement of operations and a statement of changes in net assets. . . . The General

Partner also furnishes to the Limited Partners a report on the status of the Partnership, including performance of the Partnership relative to industry benchmarks, at least quarterly." The plaintiff testified that neither he nor the LLC issued any quarterly statements to the limited partners. This clear failure to provide statements to limited partners as promised in the circular constitutes substantial evidence from which the defendant reasonably could conclude that the plaintiff omitted to state a material fact necessary to make statements not misleading in connection with the offer, sale or purchase of a security, and constituted an act, practice or course of business that would operate as a fraud or deceit. See General Statutes § 36b-4 (a) (2) and (3).

F

Timing of Investment and Amount of Loss

The record reflects that Segan invested $152,724.01 in the fund on December 10, 2001. Segan testified that despite requesting that his funds be invested immediately, the plaintiff informed him that his funds would not be invested until January 2, 2002. Segan also testified that at the end of January, 2002, the plaintiff informed him that his investment had decreased in value by approximately 10 percent. The record reflects, however, that by December 31, 2001, Segan's investment had decreased to $10,947, a drop of more than 95 percent. The foregoing constitutes substantial evidence from which the defendant reasonably may have found that the plaintiff made untrue statements of material fact regarding both the timing of Segan's investment and the amount of loss and that this misrepresentation further constituted fraud or deceit. See General Statutes § 36b-4 (a) (2) and (3).

In light of the foregoing, the substantial evidence in the administrative and trial court records and the

conclusions that reasonably may be drawn therefrom support the defendant's findings that the plaintiff committed four violations of § 36b-4 (a) (2) for omission of material facts in the offer and sale of a security, two violations of § 36b-4 (a) (2) for making untrue statements of material facts in the offer and sale of a security and three violations of § 36b-4 (a) (3) for engaging in a fraudulent practice or course of business. As such, we conclude that the actions of the defendant with regard to finding violations of § 36b-4 (a) were not unreasonable, arbitrary, illegal or an abuse of its discretion; see *Cornelius* v. *Dept. of Banking*, supra, 94 Conn. App. 551–52; and, consequently, we must affirm the judgment of the trial court.

## III

### FAILURE TO REGISTER

Next, we briefly address the plaintiff's claim that the LLC was not required to register as an investment adviser and that he was therefore not required to register as an investment adviser agent.[10] With regard to this

_____

[10] See footnote 4. " 'Investment adviser agent' includes (i) any individual, including an officer, partner or director of an investment adviser, or an individual occupying a similar status or performing similar functions, employed, appointed or authorized by or associated with an investment adviser to solicit business from any person for such investment adviser, within or from this state, and who receives compensation or other remuneration directly or indirectly, for such solicitation; or (ii) any partner, officer, or director of an investment adviser, or an individual occupying a similar status or performing similar functions, or other individual employed, appointed, or authorized by or associated with an investment adviser, who makes any recommendation or otherwise renders advice regarding securities to clients and who receives compensation or other remuneration, directly or indirectly, for such advisory services." General Statutes (Rev. to 2003) § 36b-3 (a) (11) (A). " 'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities. . . ." General Statutes (Rev. to 2003) § 36b-3 (a) (10).

claim, the plaintiff's brief is devoid of any legal analysis or citation to case law. Rather, it is filled with bald assertions and conclusory statements of law.[11] This court and our Supreme Court "consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004). Consequently, we decline to review the plaintiff's claim.

## IV

## PROCEDURE

Finally, the plaintiff presents a laundry list of claims relating to the procedure followed by the defendant. We address each in turn.

## A

The plaintiff first claims that he was denied his rights set forth in General Statutes § 4-182 (c). That statute provides in relevant part: "No revocation, suspension, annulment or withdrawal of any license is lawful unless,

[11] The plaintiff also asserts that the trial court "ignored" a typewritten "road map" contained in the appendix to his appellate brief. He claims that the so-called road map outlines his arguments regarding the proper application of various federal and state statutes and rules to his claim. He further states that he was not required to register as an investment adviser agent because "[t]he LLC was not obligated to register [for] many reasons as summarized in the Appendix of this brief." While it is entirely permissible to include regulatory and statutory provisions in an appendix to an appellate brief; see Practice Book § 67-4 (e); it is not permissible to use the appendix either to set forth argument or to evade the thirty-five page limitation provided in Practice Book § 67-3 and already met by the plaintiff's brief. See W. Horton & K. Bartschi, Connecticut Practice Series: Connecticut Rules of Appellate Procedure (2009 Ed.) § 67-8, p. 219 (authors' comments); see also *State* v. *Jones*, 193 Conn. 70, 74–75 n.2, 475 A.2d 1087 (1984). As this court often has observed, "[a]lthough we are solicitous of the fact that the [plaintiff] is a pro se litigant, the statutes and rules of practice cannot be ignored completely." (Internal quotation marks omitted.) *State* v. *Peay*, 111 Conn. App. 427, 430, 959 A.2d 655 (2008).

prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of the facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. . . ." General Statutes § 4-182 (c). The order and judgment from which the plaintiff appeals do not revoke, suspend, annul or withdraw any license. The plaintiff simply states that the defendant "did intend to 'suspend' [his] license and foreclose his ability to register in the future," without any citation to the record. Further, the plaintiff does not argue that he was denied his right to due process of law under the constitution of Connecticut or the fourteenth amendment to the United States constitution,[12] nor does he specifically allege that he did not receive adequate notice and opportunity to be heard. As such, there is no indication in the record or in the plaintiff's brief that § 4-182 (c) was violated.

B

The plaintiff next claims that the defendant failed to provide him with an opportunity to present a brief and oral argument before rendering a final decision as required by General Statutes § 4-179 (a). Section 4-179 (a) provides in relevant part: "When, in an agency proceeding, a majority of the members of the agency who are to render the final decision have not heard the matter or read the record, the decision, if adverse to a party, shall not be rendered until a proposed final decision is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions and present briefs and oral argument . . . ." General Statutes § 4-179 (a). The plaintiff argues that § 4-179 (a) applies to the present case because a hearing

[12] The plaintiff's brief contains an entire section related to the procedural claims addressed herein. Although the introduction to that section does provide a very brief summary of the Bill of Rights and the fourteenth amendment, he does not invoke either in his substantive argument.

officer presided over the hearing and drafted the order, but the defendant issued the order. He asserts that the defendant did not read the record prior to rendering his final decision and that he, therefore, had a right under § 4-179 (a) to present argument before the defendant issued the final order.

This is not the case. There is no indication in the record to support the plaintiff's assertion that the defendant did not read the record prior to issuing a decision. On the contrary, the record indicates that hearing officer William Nahas, Jr., transmitted the transcripts and exhibits from the hearing to the defendant along with a copy of the proposed order. Further, in the memorandum accompanying that transmittal, Nahas reminded the defendant that he must either read the record or serve a copy of the proposed order on the plaintiff and provide him with an opportunity to be heard. The record before us indicates that the defendant chose the former. The order explicitly notes that the defendant "read the record" before rendering his decision. "In challenging an administrative agency action, the plaintiff has the burden of proof." (Internal quotation marks omitted.) *Finley* v. *Inland Wetlands Commission*, 289 Conn. 12, 37, 959 A.2d 569 (2008). Absent a showing by the plaintiff to suggest that the defendant did not read the administrative record prior to issuing the final order, we take the defendant at his word. See *Solomon* v. *Connecticut Medical Examining Board*, 85 Conn. App. 854, 858–59, 859 A.2d 932 (2004) (attestation that member of administrative panel read entire record prior to issuing decision sufficient to satisfy § 4-179 [a]), cert. denied, 273 Conn. 906, 868 A.2d 748 (2005).

C

The plaintiff next claims that members of the department of banking engaged in ex parte communications in violation of General Statutes § 4-181 (c). That statute

provides: "Unless required for the disposition of ex parte matters authorized by law, no party or intervenor in a contested case, no other agency, and no person who has a direct or indirect interest in the outcome of the case, shall communicate, directly or indirectly, in connection with any issue in that case, with a hearing officer or any member of the agency, or with any employee or agent of the agency assigned to assist the hearing officer or members of the agency in such case, without notice and opportunity for all parties to participate in the communication." General Statutes § 4-181 (c).

This court has held that the purpose of § 4-181 (c) is "to preclude litigious facts [from] reaching the deciding minds without getting into the record. . . . The purposes of § 4-181 are to prevent one party from exerting improper influence on the decisionmaker . . . and to ensure that the reasons underlying his or her decision are on the record." (Internal quotation marks omitted.) *Menillo* v. *Commission on Human Rights & Opportunities*, 47 Conn. App. 325, 329–30, 703 A.2d 1180 (1997).

In the present case, the plaintiff asserts that investigators for the department of banking and members of its securities division communicated with the office of the chief state's attorney and with other individuals related to the plaintiff's case. The plaintiff claims that these constituted ex parte communications in violation of § 4-181. He is incorrect. The plaintiff did not allege that either Nahas or the defendant engaged in ex parte communications. Further, the individuals whom he claims had such communications were not "assigned to assist" Nahas or the defendant. As such, there was no violation of § 4-181.

## D

The plaintiff next claims that the defendant violated section § 36a-1-50 of the Regulations of Connecticut

State Agencies by reversing the hearing officer's procedural ruling, which would have given the plaintiff additional time to file a brief at the administrative hearing. The plaintiff readily admits, however, that the defendant later reversed the ruling and accepted the plaintiff's late brief. Because the defendant reversed his ruling, the plaintiff cannot show (nor does he attempt to show) that he was prejudiced by the ruling. Therefore, we need not address the question of whether the defendant violated § 36a-1-50. "[N]ot all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown." (Internal quotation marks omitted.) *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 97, 596 A.2d 374 (1991).

E

The plaintiff also claims that the defendant violated the law by filing a separate action in the Superior Court to enforce the order against him. After the defendant issued his order, the plaintiff filed a motion with the court in the present case to stay enforcement of the defendant's order pending appeal. The court denied that motion. Thereafter, the defendant filed a separate action in the Superior Court seeking enforcement of the order (enforcement action).[13] The defendant sought a prejudgment remedy in the enforcement action, which the court granted. In the present case, the plaintiff claims that the defendant's actions in filing the separate enforcement action were "in abrogation of the prejudgment remedy statute, General Statutes § 52-278j." The plaintiff does not, however, provide any legal basis or

---

[13] We take judicial notice, as requested by the defendant, of the defendant's enforcement action, *Burke* v. *Papic*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-06-4020422-S, pursuant to our authority to take judicial notice of files of the Superior Court. See *In re Selena O.*, 104 Conn. App. 635, 648, 934 A.2d 860 (2007). That case remains pending in the Superior Court.

analysis from which we could conclude that such an illegality occurred. We, therefore, decline to review this claim because it was briefed inadequately. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failing to brief the issue properly." (Internal quotation marks omitted.) *Housing Authority* v. *DeRoche*, 112 Conn. App. 355, 360 n.6, 962 A.2d 904 (2009).

In addition, the plaintiff does not suggest the remedy that this panel or the trial court can provide for the alleged illegality of a separate action from which no appeal has been filed. The plaintiff's claim is nothing more than an attempt to collaterally attack the enforcement action. "A collateral attack on a judgment is a procedurally impermissible substitute for an appeal." (Internal quotation marks omitted.) *Gerte* v. *Logistec Connecticut, Inc.*, 283 Conn. 60, 63, 924 A.2d 855 (2007). The plaintiff had an opportunity to appeal directly from the issuance of the prejudgment remedy; see General Statutes §§ 52-278*l* and 52-325c; and we will not permit him to attack a judgment of the trial court collaterally when he failed to do so directly. See *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 601–602, 922 A.2d 1073 (2007).

F

Finally, the plaintiff claims that the introduction into evidence of a copy of the sample account statement provided to Segan deprived him of due process of law. As discussed previously, the defendant charged the plaintiff with making untrue statements of material fact and fraud in violation of § 36b-4 (a) (2) and (3) for presenting Segan with the sample account statement. In his final order, however, the defendant found no violation connected to the sample account statement.

We reiterate that "not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown." (Internal quotation marks omitted.) *Jutkowitz* v. *Dept. of Health Services*, supra, 220 Conn. 97. There is no indication in the record or in the plaintiff's brief on appeal that his case was prejudiced by the introduction of the sample account statement, particularly because the defendant found that providing the sample account statement to Segan did not constitute a violation of § 36b-4 (a). Consequently, we do not reach the question regarding whether it was proper to admit the exhibit.[14]

In light of the foregoing, it is apparent that the defendant's order and the court's review thereof do not meet any of the requisites set forth in § 4-183 (j) that would permit reversal of the judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] The plaintiff also attempts to set forth a claim regarding an earlier decision of the defendant, which is procedurally unrelated to the present case. The documents associated with that decision were admitted into evidence at the administrative hearing because it involved an order to cease and desist, notice of intent to fine and notice of right to hearing issued against the LLC. In his present appeal, the plaintiff asserts that he was injured as a result of that earlier decision. Because that claim is not properly before us in the present case, we decline to afford it review.